Opinion issued March 29, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-01000-CV

———————————

Mary Collins, Appellant

V.

Sunrise
Senior Living Management, Inc. and Nick Roccaforte, Appellees



 



 

On Appeal from the 125th District Court

Harris County, Texas



Trial Court Case No. 2008-49128

 



 

MEMORANDUM OPINION

Plaintiff-appellant
Mary Collins appeals here from a take-nothing judgment on a jury verdict in
favor of the defendants-appellees Sunrise Senior Living Management, Inc. (SSLM)
and Nick Roccaforte.  We affirm.

BACKGROUND

Collins d/b/a Collins Home
Healthcare provides personal care services for the elderly at independent and
assisted living facilities in Houston. 
Beginning in 2004, she contracted with several families at Eden Terrace,
an independent living facility in Kingwood, Texas that is managed by SSLM.  In 2008, a family receiving services from
Collins at Eden Terrace—Mr.  and Mrs. Stiver—complained to the executive director Roccaforte that Collins was
overcharging for services.  This
incident, in conjunction with other documented complaints about Collins’s
services, led to Roccaforte’s banning Collins from the facilities and
terminating her contracts with several residents.  

Collins sued SSLM and Roccaforte
under tortious interference and defamation theories.  The trial court entered judgment on the jury’s
verdict in the defendants’ favor, and Collins appealed here on numerous legal
and evidentiary theories.  We begin with
a summary of the trial evidence about the parties and the events that led to
their dispute.  

A.   Eden Terrace, Roccaforte, and Collins
   

Eden Terrace has three campuses—independent living, assisted living, and
dementia care.  To be a resident in their
independent living facility, each resident must sign a Residency Agreement that
governs the terms of their leasing arrangement.[1]  The typical Residency Agreement also directly
addresses the issue of private duty aides:

V.      Private Duty Policy. You may, at your own expense,
employ a private duty aide (e.g., private nurses, sitters, etc.), only with prior
notice to the Community.  Any private duty
aide engaged by you will not become or be considered [SSLM]’s employee.  You and the private duty aide will be required
to follow the Community’s policies and procedures concerning private duty aides
and the aide maybe removed or excluded from the community for violation
thereof. 

Roccoaforte testified that as
executive director of Eden Terrace, he is “entrusted with an obligation and a
responsibility to ensure the safety and welfare of all the residents and
employees under [his] direction.”  He
believes his “first priority to that community is the residents,” and has been
trained “that every resident should be treated with dignity and with respect,
with compassion and with attention to detail.” 
Those duties include being responsive and helpful when “a resident has a
complaint or concern,” and taking action “if there is an issue relating to a
resident or a family member that . . . may be detrimental to their health or
their care or may create some kind of a serious situation that we could avoid.”  Several family members of Eden Terrace
residents testified that Roccaforte’s understanding of his obligations was
consistent with their expectations that Eden Terrace’s management would act
when necessary to ensure the welfare of residents and prevent their harm or
exploitation.

  
Collins’s ability to contract to work on the premises of Eden Terrace
was contingent upon her executing two agreements: “Private Duty Aide
Acknowledgement & Indemnifications” and “Private Duty Aide Guidelines and
Expectations.”  By executing the
Acknowledgement and Indemnification form, Collins agreed that she would “follow
the Private Duty Aide Guidelines and
Expectations, and any other rules, regulations, policies, or procedures
that [SSLM] or the community develops, now or in the future, about the conduct
of Private Duty Aides and visitors on the community’s premises.”  The Guidelines and Expectations set forth
several behaviors required while providing services in a SSLM community,
including (1) sign in and out at the desk every time she provided services at
the community, (2) always wear a name badge, (3) remain in designated work
areas at all times, and (4) not solicit business on the property.    The Guidelines and Expectations further
provide “that failure to follow the above guidelines may result in immediate
loss of privileges to provide services to residents in th[e] community.”  

B.  
Evidence
of a History of Complaints and Concerns Related to  Collins

Although several residents’ family
members testified to having a good working relationship with Collins, there was
evidence that Collins often refused to follow required procedures on the
premises.  Specifically, she refused on
many occasions to sign in or out, and she did not always wear a name
badge.  Roccaforte also personally witnessed,
and received reports from residents about, her soliciting clients at Eden
Terrace.  While Roccaforte testified to
his belief that he could have banned Collins from the premises based on these
infractions, they were not the determining factor in the later decision to do
so.  Rather, “[t]hose were factors that
led up to an accumulation of issues relative to the reports that [he] had been
receiving from families, residents, and other staff members.”  More significant in Roccaforte’s mind were
“other items relative to her potential mistreatment or potential, you know,
rudeness and the way she presented herself to the residents.” 

Eden Terrace kept “daily logs,”
which contained handwritten notes by various staff members about different
types of “occurrences that happened on a daily basis,” with sections for the
date, subject matter, what happened, and what action was taken.  Numerous daily logs entries from 2007 and
2008 memorializing complaints regarding Collins’s treatment, lack of
responsiveness, and strained interaction with both residents and employees of
Eden Terrace were admitted into evidence. 
These included complaints about Collins’s (1) failing to bring residents
down for meals, (2) calling 911 and having a resident transported to the
hospital without notifying Eden Terrace, (3) abandoning residents that were in
her care at the front desk, (4) failing to contact a resident’s family members
after that resident suffered a fall, despite representing that she would, (5)
exhibiting rudeness and hostility towards Eden Terrace staff, particularly when
they tried to contact her on behalf of her clients, and (6) taking employee
meals without asking. 

Carol Gross, an Eden Terrace
employee, testified to being asked frequently by residents for assistance in
locating or contacting Collins, and that Collins would become angry when Gross
called her on behalf of residents.  Gross
also recited an incident in which Collins pushed on the back of a resident who
was using a walker to get her to stand up straight, which Gross considered a
“safety issue” because it could cause a fall. 
She considered Collins’s treatment of the resident in that incident as
unprofessional.  

C.  
Evidence
About Complaints that Collins was Overcharging and Threatened the Stivers  

In April 2008, Mr. Stiver, an Eden
Terrace resident, came to Roccaforte and Eden Terrace’s business manager,
Giannina, several times over a three-week period, expressing concern about the
treatment he and his wife received from Collins.  Mr. Stiver was “concerned about his finances”
and relayed that he “had been spoken to in tones that were not the most
appropriate; he had been afraid to work with her, and he also said that she had
been demanding to be paid for services.” 


Because one of Mr. Stiver’s
complaints was that he had been paying Collins weekly, but thought he was only
supposed to be paying her monthly, Roccaforte offered to sit down with Mr.
Stiver and Giannina to look over Mr. Stiver’s checkbook.  They did so, and confirmed that Mr. Stivers
had been writing weekly checks to Collins in various amounts: $250, $300, $270,
etc.  When Mr. Stiver’s told Roccaforte
that he believed he had been overpaying, Roccaforte suggested that Mr. Stiver
not immediately pay Collins, and let Roccaforte either talk to Mr. Stiver’s
family or look at the agreement with Collins to try to understand what the
relationship and compensation was supposed to be.  

Roccaforte called the Housers, Mr.
Stiver’s daughter and son-in-law, to inquire about specifics of the agreement
with Collins.  Mrs. Houser explained to
him that “her agreement with Ms. Collins was to care for her mom, maybe some
bathing and also some medication management and that was an agreed upon price
of $300 per month.”  The Housers then
came to the Eden Terrace in person, reviewed Mr. Stiver’s checks, confirmed to
Roccaforte again that the amounts were inconsistent with their agreement and
indicated that they planned to terminate the relationship with Collins. 

Roccaforte and Giannina
investigated and prepared a note to their files documenting their meeting with
the Housers and the evidence they reviewed indicating that Collins was being
overpaid.  That same note recommended
that Eden Terrace have a nurse assess Mrs. Stiver to understand what kind of
care she required and help transition the Stivers from Collins’s care, since
Mr. Stiver “is basically afraid of her and intimidated by her presence and
style.”  

Trianna Rickman, another Eden
Terrace employee, testified that in the late-April 2008 timeframe, Mr. Stiver
came to her upset because Collins had called that morning demanding to be
paid.  She then witnessed a confrontation
between Collins and Mr. Stiver in the hallway during which Collins was asking
for payment and then “raised her voice at him; and she said, if you don’t pay
me you are not going to get your medications back.”  Rickman later overheard Mr. Houser speaking
on a cell phone to Collins, saying “if you don’t bring those medications back
now I am calling the police.”           

The Housers’ deposition testimony
played at trial was consistent with Rickman’s and Roccaforte’s testimony.  They both testified that they negotiated an
agreement with Collins in February 2008 to provide monthly services to Mr. and
Mrs. Stiver for $300.[2]  Mr. Houser had a power of attorney over Mr.
Stiver’s financial affairs, and Collins was instructed to contact the Housers
“in regards to any problems or issues that might develop with the Stivers.”  He testified that Collins never contacted the
Housers about the Stivers needing increased care or notified them that Collins
would be charging the Stivers additional money for her services. 

When Mr. Stiver initially began
complaining to Mr. Houser about issues with Collins, Mr. Houser did not jump to
conclusions; he believed that Mr. Stiver might be confused because they “knew
of no other complaints” about Collins and knew that Mr. Stiver “had lost a
certain capacity . . . [and] sometimes he misinterpreted things.”  Mrs. Houser similarly testified that she
discounted early complaints from Mr. Stiver about Collins because she assumed
they were related to his developing dementia. 


Mr. Houser immediately became
concerned, however, when he witnessed an altercation between Mr. Stiver and
Collins in which she threatened him with transfer from independent living to
assisted living, which would have restricted his freedom.  Mr. Houser testified that Mr. Stiver was
scared and “visibly upset by the statements made by Collins” and he opined that
her behavior was inappropriate and amounted to “mistreatment,” especially given
Mr. Stiver’s “mental functional incapacity.” 
Mrs. Houser likewise witnessed an argument between Collins and Mr.
Stiver that she did not think was appropriate, but she did not view it as rising
to the level of mistreatment.  

After the Housers met with Eden
Terrace management and reviewed Mr. Stiver’s checkbook, Mr. Houser called
Collins, told her that her services were no longer needed, and requested the
return of Mr. Stiver’s medication.  Collins
responded that she would not return the medication until she was paid the money
she was due for the Stivers’ care.  When
Collins finally returned the medication, Mr. Houser wrote her a last check for
$300.  Both Housers testified that they
believe Collins took advantage of Mr. Stiver’s incapacity by overcharging
him.  

D.  
The
Revocation of Collins’s Eden Terrace Privileges and the Dispute Giving Rise to
this Lawsuit 

On April 30, 2008, Roccaforte
informed Collins, in a meeting and with a letter, that her privileges at Eden
Terrace were being revoked.  Collins’s
tortious interference and defamation claims are based upon two letters Roccaforte
wrote in conjunction with this decision: the letter informing Collins that her
privileges were revoked (“Collins Letter”), and another letter given to three
Eden Terrace residents who contracted with Collins (“Residents Letter”).  The Collins Letter stated, in its entirety:  

Dear Ms. Collins:

Over the last year the staff at Eden Terrace
of Kingwood has had concerns with your responsiveness to our residents with
whom you have provided services. It has also been reported to me on a number of
occasions your rude and arrogant attitude toward our staff and their efforts to
contact you when one of your clients is looking for you. This is not the type
of relationship we seek with any service provider who has the privilege of working
with our residents. I have personally discussed these and other issues with you
over the last year.

Recently I have been approached by employees,
residents and family members regarding the way you and your employees provide
service to and treat our residents. These complaints involve misconduct
regarding not providing the services your have promised, not being available
when called and/or providing and charging for services that were not requested.
Of more concern is the reports I have received regarding your mistreatment, disrespect
and threatening posture towards our residents regarding telling them who they can
and cannot speak to, what they can say regarding your services and threatening
to turn them in if they do not do as your [sic] say or pay your bill.

Operating a business in this manner is not
accepted here at Eden Terrace of Kingwood. 
The privilege you have enjoyed by being able to offer services to any
resident at Eden Terrace is no longer available. Effective 05/01/08, Eden
Terrace will no longer recommend your services and you are hereby given notice
to vacate and not return to these premises, nor solicit any further business
from our residents. You may have your mother, who is one of your employees, finish
providing services to any and all residents you have an agreement with until
05/15/08. Between now and then, family members and residents will have 2 weeks
to transition whatever services your company is providing to another company.
We will notify residents here at Eden Terrace of the situation and assist them
in finding another company.

It is unfortunate this action must be taken,
but necessary to protect our residents.

Roccaforte gave this letter only to Collins,
although two other Eden Terrace employees were witnesses to Roccaforte reading
the letter to Collins. 

The Residents Letter, prepared to
give notice to Collins’s clients that she was no longer permitted to provide
services on the premises, provided in its entirety:  

Mary Collins of “Collins Home Health” is an
independent contractor who has had the privilege of offering a variety of
services to our residents here at Eden Terrace of Kingwood. Unfortunately that
privilege is being revoked as of 05/01/08 for serious allegations relating to
misconduct and resident mistreatment. If you have an agreement or arrangement
with this company for service please be advised that they will no longer be allowed
to enter Eden Terrace of Kingwood to service any of our residents after 05/15/08.

We will be happy to assist you in finding
another service to address your needs. You can contact our Health Care
Coordinator, Jackie Lorenz, RN, who can guide you to the appropriate service.
We have a list of preferred providers that can be shared with you given your
specific needs. 

Please make arrangements to transition from
Collins Home Health as soon as possible and no later than 05/15/08. If you have
any questions ·or concerns you can contact me directly at [phone number].

Roccaforte had this letter hand-delivered to three
residents who had contracts with Collins. 
A copy was also placed under a calendar at the reception desk so that
each shift of workers that came could be apprised of the situation.  

E.   Collins’s Trial Testimony

  
Collins agreed that she contracted to assist the Stivers for $300 per
month, but testified that agreement changed in February or March 2008.  Around that time, Collins testified, another
home health service company that was seeing the Stivers weekly told her that
“they needed hourly services and that also Mr. Stiver need[ed] assistance with
his medication.”  Collins’s understanding
at that point was that the Stivers both needed more care or they would have to
be moved to an assisted living facility. 
She testified that Mr. Stiver and the Housers asked her to perform
additional services at that point, which was the first time she claims to have
ever discussed her services with the Housers. 
Going forward, under their new arrangement, Collins testified that Mr.
Stiver started paying her weekly a $12 hourly wage, for approximately 21 to 24
hours per week (which were mostly performed by Collins’s mother).  According to Collins, Mr. Stiver agreed to
that rate, and the Housers were aware of the arrangement and rate.  

  
When asked about allegations in the letter from Roccaforte banning her
from the premises, she denied overcharging Mr. Stiver or anyone else.  She admitted that she had conflicts with Eden
Terrace staff, but explained that she was just sticking up for herself.  She likewise conceded that Roccaforte had
received complaints about her alleged misconduct and mistreatment, but asserted
that these complaints were false. 
Finally, she testified that the defendants injured her reputation with
residents at Eden Terrace.     

TRIAL COURT PROCEEDINGS

  
Collins brought claims against SSLM and Roccaforte for (1) tortuous
interference with existing business relations, (2) tortuous interference with
prospective business relations, (3) defamation, defamation per se,
republication, and self-republication, and (4) business disparagement.  The defendants pleaded, inter alia, (1) justification as a defense to the tortious interference
claim, and (2) both self-publication by Collins and truth or substantial truth
as a defense to the defamation claims.  

The trial court granted a directed
verdict in the defendants’ favor on Collins’s claims for defamation per se,
republication, and self-republication. 
The remaining claims were submitted to the jury. 

A.   The Jury’s Verdict and the Trial
Court’s Judgment

In response to questions about
Collins’s tortious interference claim, the jury found that “Roccaforte
intentionally interfere[d] with an existing contract between Mary Collins and
residents with whom she contracted with at Eden Terrace,” but also found that
“Roccaforte interfere[d] because he had a good-faith belief that he had a right
to do so.”  The jury did not answer a
damage question related to the tortious interference claim, because the damages
question was predicated on an affirmative finding of tortious interference and
a negative finding of a good-faith belief. 


In response to questions about
Collins’s defamation claim, the jury found that Roccaforte did not “publish the
alleged defamatory matter.”  Because the
remainder of the defamation questions were predicated on an affirmative finding
of publication, the jury did not answer whether (1) the alleged defamatory
matter was “defamatory concerning Mary Collins,” (2) the alleged defamatory
matter was “substantially true at the time it was made,” or (3) Roccaforte knew
or should have known that “the defamatory communication was false and that the
potential to be defamatory.”

In response to questions about
Collins’s business disparagement claim, the jury found that Roccaforte did not
“disparage the business of Mary Collins.” 
Because the damage questions were predicated on affirmative liability
findings, the jury did not answer the damages or punitive damages questions
related to Collins’s defamation or disparagement claims.  

The trial court entered a take-nothing
judgment in favor of the defendants on the jury’s verdict, and Collins timely
appealed.

THIS APPEAL

Collins seeks reversal of the trial
court’s judgment in thirteen issues:

(1)     Collins established tortious interference as a matter of law. The
trial court erred in denying her motion for directed verdict and for judgment notwithstanding
the verdict (“JNOV”) as to tortious interference.

(2)     The trial court erred by submitting question no. 2 to the jury
over Collins’[s] objections because the appellees were not entitled to assert
the defense.  

(3)     The trial court erred in accepting the jury’s answer to question
no. 2 as there is no evidence to support it, or alternatively there is no
factually sufficient evidence that Roccaforte had a good faith belief that he
had a legal right to interfere.

(4)     The trial court erred in denying Collins’[s] motion for directed
verdict and JNOV as to defamation because the evidence conclusively establishes
and as a matter of law Collins should have prevailed on her claim for defamation.

(5)     The trial court erred by submitting question no. 4 “Did
Roccaforte publish a defamatory matter?” to the jury because the question was
defective as it failed to clearly ask whether a statement or conduct was
published.

(6)     The trial court erred in accepting the jury’s answer to question
no. 4 as it is against the great weight and preponderance of the evidence and
is manifestly unjust because the appellees’ publication of the communications
is undisputed.

(7)     The trial court erred by submitting the defense of substantial
truth to the jury and granting judgment upon it because as a matter of law the appellees
cannot prevail on the defense of “substantial truth” given that the underlying
facts as to the truth and gist of the defamatory charge are wholly in dispute.

(8)     The trial court erred in allowing inadmissible evidence to be
used as evidentiary support for the appellees’ affirmative defense of
substantial truth to prove the truth of the matter asserted; thereby the trial
court also erred in denying Collins’[s] motion for new trial and JNOV as to her
claims for defamation.

(9)     The trial court erred by excluding Collins’[s] claims of
defamation per se, republication, and self-publication in the trial court’s
jury charge and denying Collins’[s] request for findings of fact and
conclusions of law.

(10)   The trial court erred in denying Collins’[s] JNOV as to the
defamation claims of defamation per se, business disparagement, republication,
and self publication given that the evidence conclusively established the
elements as a matter of law.

(11)   The trial court erred in denying Collins’[s] JNOV as to question
10: the jury answered “No” as to “Did Nick Roccaforte disparage the business of
Mary Collins?” because the jury’s answer is against the great weight and preponderance
of the evidence and is manifestly unjust.

(12)   The trial court erred by denying Collins’[s] motion for a mistrial
because Roccaforte’s testimony regarding inadmissible evidence.

(13)   The trial court abused its discretion by admitting appellees’
exhibits 7, 9, 10, 11, 13, and 21 because the evidence was inadmissible as a
matter of law.

The defendants also raise three
conditional cross-issues:

(1)            
Whether the alleged defamatory statements were true?

(2)            
Whether the alleged defamatory statements were constitutionally protected
opinions?

(3)            
Whether Appellees were justified in making the alleged defamatory
statements?

Standards of Review

A.   Sufficiency of the Evidence

When challenging the legal
sufficiency of an adverse jury finding on which the party had the burden of
proof at trial, the appellant “must demonstrate that the evidence conclusively
establishes, as a matter of law, all facts in support of the issue.”  Jordan
v. Sava, Inc., 222 S.W.3d 840, 853 (Tex. App.—Houston [1st Dist.  S.W.2d 2007, no pet.) (citing Sterner v. Marathon Oil Co., 737 S.W.2d
686, 690 (Tex. 1989)).  When challenging
the legal sufficiency of the evidence to support a finding on which it did not
have the burden of proof at trial, appellant must demonstrate on appeal that no
evidence exists to support the adverse finding. Casino Magic Corp. v. King, 43 S.W.3d 14, 19 (Tex. App.—Dallas 2001,
pet. denied) (citing Croucher v. Croucher,
660 S.W.2d 55, 58 (Tex. 1983)).  

We will sustain a no-evidence
challenge when (i) the record discloses a complete absence of evidence of a
vital fact, (ii) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact, (iii) the evidence
offered to prove a vital fact is no more than a mere scintilla, or (iv) the
evidence establishes conclusively the opposite of the vital fact.  Marathon
Corp. v. Pitzner, 106 S.W.3d 724, 727 (Tex. 2003).  We look to see whether any record evidence
supports the challenged finding.  Casino Magic, 43 S.W.3d at 19.  Anything more than a scintilla of evidence is
legally sufficient to support the jury’s finding. Id.

To determine whether the evidence
was factually sufficient to support a finding, an appellate court considers and
weighs all evidence that was before the trial court.  Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986); Raymond
v. Raymond, 190 S.W.3d 77, 82–83 (Tex. App.—Houston [1st Dist.] 2005, no
pet.).  When an appellant attacks the
factual sufficiency of an adverse finding on an issue for which it had the
burden of proof, the appellant must demonstrate that the adverse finding is
against the great weight and preponderance of the evidence.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001).  In reviewing an “insufficient-evidence” point
challenging the factual sufficiency of the evidence to support a finding that
favors the party who had the burden of proof on that finding, the reviewing
court may set aside the finding only if a review of all the evidence, both for
and against the finding, demonstrates that the finding is clearly wrong and
manifestly unjust. Garza v. Alviar,
395 S.W.2d 821, 823 (Tex. 1965). 

We must not, however, substitute
our judgment for that of the fact finder.  Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).  “Courts reviewing all the evidence in a light
favorable to the verdict thus assume that jurors credited testimony favorable
to the verdict and disbelieved testimony contrary to it.”  City of
Keller v. Wilson, 168 S.W.3d 802, 819 (Tex. 2005).

B.  
Admission
of Evidence

A trial court’s rulings in
admitting or excluding evidence are reviewable under an abuse of discretion
standard.  Nat’l Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000).
 To determine whether a trial court
abused its discretion, we must decide whether the trial court acted without
reference to any guiding rules or principles; in other words, we must decide
whether the act was arbitrary or unreasonable.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985), cert. denied, 476 U.S. 1159 (1986).
Merely because a trial court may decide a matter within its discretion in a
different manner than an appellate court would in a similar circumstance does
not demonstrate that an abuse of discretion has occurred. Id.

Tortious
Interference and the Justification Defense

In her first three issues, Collins
argues that she is entitled to judgment as a matter of law on her tortious
interference claim and, thus, that the trial court erred by granting judgment
in the defendants’ favor on that claim. 
Specifically, she contends both that (1) she conclusively established
that Roccaforte intentionally interfered with her contract with Eden Terrace
residents and (2) the defendants’ justification defense fails as a matter of
law for legal and evidentiary reasons. 
Because the jury found that Roccaforte intentionally interfered with
Collins’s contracts with Eden Terrace residents—and because the defendants do not challenge that finding—we do not reach Collins’s first issue and instead restrict
our analysis to the defendants’ justification defense.  

Collins argues that (1) “the
appellees failed to produce a legal contract to support their legal
justification defense,” and (2) “the appellees did not plead and were not
entitled to assert a good faith claim to a colorable legal right.”  She cites Texas
Beef Cattle Co. v. Green, 921 S.W.2d 203 (Tex. 1995) for the proposition
that a justification defense can be based on either a legal right, or a
good-faith claim to a colorable legal right, but not both.  She notes that the defendants claim a right
to interfere with her contract with the Stivers based on their residency
contract, but that the trial court excluded that contract from evidence.  According to Collins, once the defendants
claimed their contract with the Stivers allowed them to interfere with the
Stivers contract with Collins, “they can no longer as a matter of law assert
the defense of a good faith claim to a colorable legal right defense.”    

Collins further asserts that the
defendants cannot rely upon a privilege or justification because they do not
have a “claimed interest” in Collins’s contract with residents.  She points to the fact that Eden Terrace is
an independent living facility, that Collins was not an employee or controlled
by Eden Terrace, and that Texas law provides that elderly residents are free to
contract without interference for outside service providers when living in
independent living facilities.  She also
insists that, under Prudential Insurance
Co. of America v. Financial Review Services, 29 S.W.3d 74 (Tex. 2000), the
defendants are foreclosed from asserting a privilege or justification defense
because they “interfered by illegal or tortious means” by defaming Collins.

Finally, Collins argues that there
is no evidence or, alternatively, factually insufficient evidence to support
the jury’s finding that “Roccaforte interfere[d] because he had a good-faith
belief that he had a right to do so.” 
Specifically, she argues that Roccaforte’s testimony that he believed he
could exclude Collins from the Eden Terrace “as part of my responsibility and
obligation . . . for the safety and welfare of the residents and staff” is
insufficient because the “defense of legal or excuse only protects good faith
assertions of legal rights, not the appellees’ job responsibilities.” 

In response, the defendants argue
that Collins has waived her sufficiency challenges by failing to adequately
brief the issue.  They further contend
that they adequately pleaded the justification defense by asserting in their
answer that they “have a quasi-statuorily protected privilege and are protected
from Plaintiff’s claims since the duty to protect elderly residents overrides
any potential duty owed to Plaintiff” and that “any actions were legally
justified as Defendants had a duty to protect residents.”  Alternatively, defendants assert that the
issue was tried by consent.  Finally, the
defendants assert that “Collins’ claim that the jury’s finding is precluded by
legal principles is meritless,” and ample evidence supports the jury’s finding
that Roccaforte had a good faith belief that he possessed a colorable legal
right to bar Collins from working on Eden Terrace’s premises. 

A.   Applicable Law

“[T]he privilege of legal
justification or excuse in the interference of contractual relations is an
affirmative defense upon which the defendant has the burden of proof.”  Sterner
v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).  Affirmative defenses must be either pleaded
or tried by consent.  Re/Max of Texas, Inc. v. Katar Corp.,
961 S.W.2d 324, 327 (Tex. App.—Houston [1st Dist.] 1997), pet. denied, 989 S.W.2d 363 (Tex. 1999).

“The justification defense is based
on either the exercise of (1) one’s own legal rights or (2) a good-faith claim
to a colorable legal right, even though that claim ultimately proves to be
mistaken.” Texas Beef Cattle Co., 921
S.W.2d at 211.  “Thus, if the trial court
finds as a matter of law that the defendant had a legal right to interfere with
a contract, then the defendant has conclusively established the justification
defense, and the motivation behind assertion of that right is irrelevant.” Id. (citations omitted).  “Improper motives cannot transform lawful
actions into actionable torts.”  Id. 
“On the other hand, if the defendant cannot establish such a legal right
as a matter of law, it may nevertheless prevail on its justification defense
if: (1) the trial court determines that the defendant interfered while
exercising a colorable right, and (2) the jury finds that, although mistaken,
the defendant exercised that colorable legal right in good faith.”  Id.


B.   Analysis

The jury found that Roccaforte
“Interfere[d] because he had a good-faith belief that he had a right to do so”
and Collins challenges that finding on several bases here.  We address first the legal arguments that
Collins advances about why the defendants should be precluded from asserting
the justification defense, and then her sufficiency challenges to the jury’s
finding.  

First, Collins asserts that the
“defendants failed to properly plead and assert the affirmative defense of a
good-faith claim to a colorable legal right in their fifth amended
answer.”  While the defendants’ answer
did not use the words, “good faith claim to a colorable legal right,” the
defendants’ answer does assert that Roccaforte’s actions were “privileged” and “legally
justified,” and that “the duty to protect elderly residents overrides any
potential duty owed to Plaintiff.” 
Because a good faith claim to a colorable legal right is subsumed within
the justification defense that was properly pleaded, Texas Beef Cattle Co., 921 S.W.2d at 211, we conclude that the
defendants’ answer gave Collins “fair notice” of their defense.  Petta
v. Rivera, 923 S.W.2d 678, 686 (Tex. App.—Corpus Christi 1996, writ
denied).          

Collins also argues that
Roccaforte’s reliance upon a contractual right to revoke Collins’s privileges
to provide care at Eden Terrace means that the defendants “can no longer as a
matter of law assert the defense of a good faith claim to a colorable legal
right defense.”  While she cites the
supreme court’s Texas Beef Cattle Co.
decision in support, we do not read that case to foreclose submission of a
good-faith belief in a colorable legal right in this case.

In Texas Beef Cattle Co., the supreme court considered the
relationship between a legal right to interfere with a contract and the good
faith reliance on a colorable legal right. 
921 S.W.2d at 211.  It explained
that “if the trial court finds as a
matter of law that the defendant had a legal right to interfere with a
contract, then the defendant has conclusively established the justification
defense, and the motivation behind assertion of that right is irrelevant.” Texas Beef Cattle Co., 921 S.W.2d at 211
(emphasis added & citations omitted). 
In other words, if the defendant conclusively proves that its
interference was caused by the exercise of the defendant’s own legal rights,
the defendant prevails over a claim for tortious interference, without the need
to submit to the jury the question of whether the defendant acted in good
faith.  Id.

The Texas Beef Cattle Co. court went on to explain that if, on the
other hand, “the defendant cannot establish such a legal right as a matter of
law, it may nevertheless prevail on its justification defense if: (1) the trial
court determines that the defendant interfered while exercising a colorable
right, and (2) the jury finds that, although mistaken, the defendant exercised
that colorable legal right in good faith.” 
Id.  We do not read Texas Beef Cattle Co. to hold that a defendant cannot
simultaneously assert two alternative justification defenses: (1) the defendant
had an actual legal right to take the actions in question, and (2) the
defendant had a subjective good faith belief that he was acting pursuant to a
legal right to do so and he in fact had a colorable legal right.  Instead, we interpret Texas Beef Cattle Co. to provide that when a legal right is
established as a matter of law, good faith need not be established.  Id.
at 211–12.  When a legal right is not established as a
matter of law, a question of whether the defendant acted in good faith is
presented for the jury if the court concludes that the defendant was exercising
a colorable right.  Prudential Ins. Co. of America v. Financial Review Servs., Inc., 29
S.W.3d 74, 80 (Tex. 2000) (“[I]f the defendant cannot prove justification as a
matter of law, it can still establish the defense if the trial court determines
that the defendant interfered while exercising a colorable right, and the jury
finds that, although mistaken, the defendant exercised that colorable right in
good faith.”).

In this case, Roccaforte testified
to his belief that he had a right to exclude Collins from the premises both
because (1) the Residency Agreements allowed him to do so, and, (2) he had a
duty as an executive to protect residents. 
The Stivers’s Residency Agreement was excluded from evidence, but the
court admitted a sample Residency Agreement. 
That agreement provides that while residents are permitted to hire
outside private duty aides of their choice, the resident and aide “will be
required to follow the Community’s policies and procedures concerning private
duty aides, and the aide may be removed or excluded from the Community for
violations thereof.”  Collins herself
acknowledged in writing that she was bound by the Private Duty Aide Guidelines and Expectations, as well as “any
other rules, regulations, policies, or procedures that [SSLM] or the community
develops, now or in the future, about the conduct of Private Duty Aides and
visitors on the community’s premises.” 
Collins also acknowledged in writing that failure to follow the
guidelines “may result in immediate loss of privileges to provide services to
residents.” 

It is proper for the trial court to
submit the justification defense to the jury if there is some evidence of a
good faith belief in a colorable legal right. 
Texas Beef Cattle Co., 921
S.W.2d at 211. The trial court denied the defendants’ motion for summary
judgment and motion for directed verdict on their right to interfere as a
matter of law.  The trial court likewise
denied Collins’s motion for directed verdict, in which she argued that she had
defeated the defendants’ justification claim as a matter of law.  Give the posture, and given that the above-cited
evidence is some evidence of Roccaforte’s good faith exercise of colorable
legal rights, the trial court properly submitted this issue for the jury’s
consideration.  

Collins next cites Prudential Insurance Company of America
for the proposition that a “party may not exercise an otherwise legitimate
privilege by resort to illegal or tortious means.”  29 S.W.3d at 81.  She argues that it “is undisputed that the
[defendants] sent the defamatory letters to Collins’ clients, published the
defamatory letters to employees and other residents, and excluded Collins from
the premises because of the false allegations.”   Thus, Collins asserts, the defendants “are
not entitled to assert the affirmative defense of privilege or justification as
a matter of law because the [defendants] interfered with Collins’ contracts through
methods tortious in themselves.”  In
other words, she contends that interference through defamatory means cannot be
justified.  

At issue in Prudential was whether a justification defense was proven as a
matter of law.  29 S.W.3d at 82.  Because the court found some evidence of
tortious conduct, i.e., business disparagement, the court held that a directed
verdict on the justification defense was not proper when the defendant
contended that he exercised a colorable legal right in good faith.  Id.
at 83.  Prudential does not hold that mere allegations of tortious conduct
foreclose applicability of the justification defense, just that when a fact
issue is raised, it should be submitted to the jury.  Here—as discussed later in this opinion—we conclude that the defendants defeated Collins’s defamation claims by
proving the allegations in Collins Letter and Residents Letter were
substantially true.  Under Prudential, Collins’s allegation that
the defendants defamed her does not
defeat the defendants’ ability to rely on their justification defense to
tortious interference.  

Collins also cites ACS Investors, Inc. v. McLaughlin, which
states that legal justification is at issue when the party “asserting the
privilege does not deny the alleged interference, but instead seeks to avoid
liability upon a claimed interest that is being impaired or destroyed by the
plaintiff’s contract.” 943 S.W.2d 426, 431 (Tex. 1997).  Collins asserts that, in this case, the
defendants’ reliance on the justification defense is foreclosed because the
defendants do not have a “claimed interest” that is being impaired or destroyed
by Collins’ contract as Collins’s “interest and/or business relationship in
servicing her clients residing at Eden Terrace does not impair or destroy the
[defendants] interest in its relationships with residents at Eden
Terrace.”  In support, she points to (1)
the independent nature of the residents’ living arrangements, (2) the
defendants’ lack of control over her care of her clients, and (3) Texas law
allowing independent living residents to contract with outside caregivers.  We disagree with Collins that the evidence
conclusively establishes that her ability to perform under her contract with residents—i.e., the interfered-with contract—did not impair the defendants’ right exercised
by excluding Collins from the premises—i.e., the right to enforce their community rules and to protect
residents’ health and well-being.  Thus, the lack of a sufficient
claimed interest does not foreclose the defendants’ reliance on the
justification defense.

Finally, Collins argues that even
if the trial court did not err by submitting the justification defense to the
jury, there is legally or factually insufficient evidence to support the jury’s
finding that Roccaforte interfered because he had a good faith belief in a
colorable right to do so.  Roccaforte
testified to his belief that the Residency Agreement and his position as the
executive director empowered him to exclude Collins from the facility for the
purpose of protecting residents.  Specifically,
Rockaforte testified to his belief that, as an executive director, he had “an
obligation and a responsibility to ensure the safety and welfare of all the
residents and employees.”  See Eloise
Bauer & Assocs. v. Elec. Realty Assocs., 621 S.W.2d 200, 203 (Tex. Civ.
App.—Texarkana 1981, writ ref’d n.r.e.) (employee acting in good faith to
further interests of employer).  The jury
heard testimony that Collins had not followed rules governing heath care aide
workers on the premises.     Roccaforte testified that he performed a
“fair investigation” into allegations about Collins before he acted, and that
he had no reservations about his decision to prohibit her from working on the
premises.  Legally sufficient evidence
supports the jury’s finding of justification. 


Collins also asserts that there
“was evidence presented at trial to the contrary of the assertion of this
[justification] defense.”  In conducting
a factual sufficiency review, we must assume that the jury credited
Roccaforte’s and other testimony in support of the verdict, and that the jury
disbelieved testimony contrary to it.  City of Keller, 168 S.W.3d at 819.  While Collins testified that she believed
that the allegations against her were without merit and that she had a strained
relationship with some members of Eden Terrace (that might give them an
incentive to paint her in a bad light), Collins has not demonstrated that the
jury’s finding that Roccaforte acted with a good-faith belief in a colorable
legal rights is “against the great weight and preponderance of the
evidence.”  Dow Chem Co., 46 S.W.3d at 242. 
There is factually sufficient evidence in support of the jury’s
finding.  

We overrule Collins’s second and
third issues.     

Defamation 

In her fifth and sixth issues,
Collins argues that Jury Question No. 4—“Did Roccaforte publish the allegedly defamatory matter?”—was defective, and that the jury’s negative
answer was not supported by the evidence. 
Specifically, she complains that the “only issue that should have been
asked in question no 4 was the element of publication: whether the defendant
‘published’ the statement.”    She
contends that “a new trial is warranted because question 4 is defective as
stated because it does not provide a statement or conduct to be
published.”  She further argues, that the
jury’s negative answer to Question No. 4 should not have been accepted by the
trial court because the opposite was conclusively established, and because the
jury’s answer is against the great weight and preponderance of the evidence and
is manifestly unjust.  

In Collins’s fourth issue, she
contends that the evidence established all the elements of her defamation claim
as a matter of law.  

Finally, in Collins’s seventh
issue, she argues that the trial court erred in submitting the defense of
substantial truth, and in granting judgment upon it, because “the underlying
facts as to the truth and gist of the defamatory charge are wholly in
dispute.”    

The defendants respond that
Collins’s objection to the form of Question No. 4 was waived by failure to
object at the charge conference.  They
further contend that this broad-form question placed two issues before the
jury: “One, did Mr. Roccaforte publish the statements?  Two, were they defamatory?”  Thus, they argue that the jury’s negative
answer can be supported by evidence either that there was no publication or
evidence that the statements were not defamatory.  Because “the evidence clearly established
that Mr. Roccaforte did not publish the letters to any parties who did not have
an interest in receiving them” and because the “jury may have concluded the
statements were simply not defamatory,” the defendants assert that the jury’s
answer is not against the great weight and preponderance of the evidence.    

The defendants contend that
Collins’s argument that she is entitled to judgment as a matter of law on her
defamation claim was waived for failure to adequately brief and, in any event,
meritless because at least a fact issue existed on this claim.  

Finally, the defendants argue that
Collins’s arguments attacking their “substantial truth” defense requests an
advisory opinion, as the judgment is not based upon this issue, and meritless,
as a dispute about underlying facts would not preclude submission of the
substantial truth defense to the jury.

In three cross-points, the
defendants also advance, as alternative bases for affirming the trial court’s
take-nothing judgment on Collins’s defamation claim, that (1) Roccaforte’s
statements were true, (2) that defendants’ statements were “inactionable
expressions of opinion,” and (3) Roccaforte’s correspondence was “privileged.”        

A.   Applicable Law 

To maintain a defamation action,
the plaintiff must establish that the defendant (1) published a statement; (2)
that was defamatory of the plaintiff; (3) while acting with actual malice, if
the plaintiff was a public figure, or, if the plaintiff was a private
individual, with negligence regarding the truth of the statement. WFAA-TV, Inc. v. McLemore, 978 S.W.2d
568, 571 (Tex. 1998);  Evans v. Dolcefino, 986 S.W.2d 69, 76
(Tex. App.—Houston [1st Dist.] 1999, no pet.).

The “publication” of an allegedly
libelous letter requires a showing that the letter was received, read, and
understood by a third person.  Putter v. Anderson, 601 S.W.2d 73, 78
(Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.).  Such “publication” need only be a negligent or
intentional act that communicates defamatory matter to a person other than the
person defamed. Baubles & Beads v.
Louis Vuitton, S.A., 766 S.W.2d 377, 380 (Tex. App.—Texarkana 1989, no
writ).

Truth is a defense to
defamation.  Klentzman v. Brady, 312 S.W.3d 886, 899 (Tex. App.—Houston [1st
Dist.] 2009, no pet.)   A
showing of substantial truth of defamatory words likewise will defeat a
defamation cause of action.  McIlvain v. Jacobs, 794 S.W.2d 14, 15–16
(Tex. 1990); Gustafson v. City of Austin,
110 S.W.3d 652, 656 (Tex. App.—Austin 2003, pet. denied) (“The defense of truth
does not require proof that the alleged defamatory statement is literally true
in every detail; substantial truth is sufficient.”).  The test of substantial truth is “whether the
alleged defamatory statement was more damaging to [plaintiff's] reputation, in
the mind of the average listener, than a truthful statement would have been.”  McIlvain.
794 S.W.2d at 16; see Turner v. KTRK
Television, Inc., 38 S.W.3d 103, 115 (Tex. 2000) (noting substantial truth
doctrine “precludes liability for a publication that correctly conveys a story’s
‘gist’ or ‘sting’ although erring in the details”); Langston v. Eagle Printing Co., 797 S.W.2d 66, 69 (Tex. App.—Waco 1990,
no writ) (concluding statement is substantially true even if it greatly
exaggerates plaintiff’s misconduct, as long as the average reader would not
attach any more opprobrium to the plaintiff’s conduct merely because of the
exaggeration).

Expressions of opinion that “cannot
reasonably be interpreted as stating actual facts” are constitutionally
protected and cannot form the basis of a defamation claim.  E.g.,
Vice v. Kasprzak, 318 S.W.3d 1, 18
(Tex. App.—Houston [1st Dist.] 2009, pet. denied). 

A “qualified privilege” under Texas
law exists when a communication is made in good faith and the author, the
recipient, or a third person has an interest that is sufficiently affected by
the communication.  Thomas-Smith v, Mackin, 238 S.W.3d 503, 509 (Tex. App.—Houston
[14th Dist.] 2007, no pet.); Hardwick v.
HL&P, 881 S.W.2d 195, 198–99 (Tex. App.—Corpus Christi 1994, writ dism’d w.o.j.) (“A qualified
privilege embraces communications made in good faith on subject matters in
which the author has an interest or to which he has a duty to perform to
another person having a corresponding interest or duty.”)  Qualified privilege justifies the statements
if they are made without malice. Dixon v.
Southwestern Bell Tel. Co., 607 S.W.2d 240, 242 (Tex. 1980); Martin v. Southwestern Elec. Power Co.,
860 S.W.2d 197, 199 (Tex. App.—Texarkana 1993, writ denied).  “The privilege is peculiarly applicable to
communications between employers and employees.”  Roberts
v. Davis, 160 S.W.3d 256, 263 (Tex. App.—Texarkana 2005, pet. denied).  “The
elements of qualified privilege are good faith, an interest to be upheld, a
statement limiting the communication to the proper scope, a proper occasion,
and publication in a proper manner and to proper parties only.”  Id.
(citing Martin, 860 S.W.2d at 199).   

B.   Analysis – “Publication” Finding

In response to the following
question, the jury answered “no”: 

QUESTION 4

Did Nick Roccaforte publish the alleged
defamatory matter?

“Publish” means intentionally or negligently
to communicate the matter to a person other than Mary Collins who is capable of
understanding its meaning.

Collins did not object to the language of this
question, so her complaint that “question 4 is defective as stated because it
does not provide a statement or conduct to be published” was not preserved for
appeal here.  Tex. R. Civ. P. 274.  

Because we measure the sufficiency
of the evidence based on the charge given, Wal–Mart
Stores, Inc. v. Sturges, 52 S.W.3d 711, 715 (Tex. 2001), we consider the
parties’ arguments in light of language of the question and the accompanying
instructions.    

The defendants urge us to interpret
Question No. 4 as asking both whether the matter was defamatory and whether
that matter was published.  We disagree
that the question can be interpreted so broadly.  The phrase “defamatory matter” is preceded by
the word “alleged,” which permits the jury to find publication even if it did
not believe the matter was defamatory. 
Moreover, the defendants’ interpretation would render Question No. 5
superfluous, as it asks whether “the statement in Question 4 was defamatory
concerning Mary Collins.”  

In light of the definition
accompanying Question No. 4, Collins is correct that there is legally
insufficient evidence to support the jury’s finding of no publication in
response to Question No. 4 because both the Collins Letter and the Residents
Letter were published to third parties.  The
Collins Letter was orally published because there were two other Eden Terrace
employees present as witnesses when Roccaforte read that letter to Collins.  Roccaforte gave the Residents Letter to three
residents that had contracts with Collins to put them on notice that her
privileges to work on the premises were being revoked.  An Eden Terrace employee testified to seeing
that letter when she placed copies into those recipient’s files.  That letter was also left under a desk
calendar for employees to view at the beginning of their shift.  This was a procedure Eden Terrace staff
practiced to pass information between shift workers.  

The defendants advance the
following arguments in support of the jury’s finding of no publication: (1) the
letters were only published to parties with an interest in receiving them, and
(2) Collins consented to publication by publishing herself.  While these arguments are relevant to the
defendants’ justification defense and to the issue of damages, they do not support
the jury’s finding that Roccaforte did not publish the letters to anyone except
Mary Collins.  We sustain Collins’s sixth
issue. 

C.   Substantial Truth

Because the trial court’s
take-nothing judgment in the defendants’ favor cannot be sustained by the jury’s
finding of no publication, we turn to the defendants’ cross-points in support
of the trial court’s judgment.  The jury
did not reach the issue of substantial truth, but the defendants argue as a
cross-point that the court’s judgment on defamation can nonetheless be affirmed
because it “is undisputed that Mr. Roccaforte’s statements were true.”[3]  According to the defendants, “the
truthfulness inquiry revolves around whether Mr. Roccaforte truthfully
summarized the complaints, not on the validity of the complaints
themselves.”  They cite Stephan v. Baylor Medical Center at Garland,
20 S.W.3d 880, 884 (Tex. App.—Dallas 2000, no pet.) as a case highlighting this
distinction.  

In Stephan, a physician who was denied staff privileges at Baylor
Medical Center sued complaining about an “adverse action report” that Baylor
filed with the National Practitioner Data Bank classifying his denial of
privileges “as being due to ‘incompetence/malpractice/negligence,’” and
containing the notation: “evidence of quality of care and medical record
documentation unacceptable to this hospital.” 
20 S.W.3d at 885.  On appeal from
a summary judgment granted in its favor on the plaintiff’s intentional
infliction of emotional distress claim, Baylor argued that there was “no
evidence that the statement made in the adverse action report were false or
defamatory in nature.”  Id. at 891–92; see also id. at 892
(“Absent a false and defamatory statement, Baylor’s conduct in publishing the
report could not be extreme or outrageous as required for an intentional
infliction of emotional distress claim.” (citing Twyman v. Twyman, 855 S.W.2d 619, 621–22 (Tex. 1993)).  The Dallas Court
of Appeals agreed, noting that irrespective
of whether the plaintiff was incompetent, negligent, or committed
malpractice, the evidence demonstrated that the “the adverse action report was
not false, but was an accurate recitation of Baylor’s findings and
conclusions.”  Id.  at 893.

According to the defendants here,
“much like the facts in Stephan,
Collins’ true complaint is not that the statements in Mr. Roccaforte’s letters
are false but that the underlying complaints were false.”  Because even “Collins admits that the
statements in the two April 30th correspondences reiterating the numerous
complaints lodged against her are true,” they assert,  “these statements cannot serve as a basis for
Collins’ defamation claim and the take nothing judgment may be affirmed on this
ground as well.”  

In response, Collins contends that
“the letters combined with the abrupt nature of [her] departure from the living
facility left a negative impression among her clients regarding her character
and reputation.”  She also argues that Stephan’s analysis is inapplicable
because she told Roccaforte that the allegations against her were false, and
because the process of evaluating physicians at issue in Stephan—which is
governed by laws requiring hospitals to investigate, provide due process to
doctors, and establish a peer review process—are fundamentally different than the standards governing heath care aid
workers.  

We agree with the defendants that
the information in the letters was substantially true, and that fact defeats
Collins’s defamation claim.  The Residents
Letter stated that Collins’s privileges were being revoked because of “serious
allegations relating to misconduct and resident mistreatment.”  At trial, while Collins denied any wrongdoing
related to any clients, she admitted that Roccaforte had received complaints
alleging “serious misconduct and resident mistreatment”: 

Q.      And that was: Verbally abusive by yelling; is that correct?

A.      Yes.

Q.      What was the other one?

A.      The withholding medication.

Q.      Withholding the medication, and anything else, the
overcharging?

A.      Overcharging.

. . . .

Q.      Do you consider those allegations to be serious?

A.      Yes.

Q.      And do you consider those allegations to be serious allegations
relating to misconduct and resident mistreatment?

A.      Yes.

. . . .

Q.      The allegations that we just discussed, you contend and agree
with me that those are serious allegations regarding mistreatment and
misconduct of residents, correct?

A.      Yes.

Q.      And the letter shows that Mr. Roccaforte received serious
allegations of resident misconduct and mistreatment; is that correct?

A.      Yes.

The Collins Letter similarly
recited—as reasons that Collins’s
privileges were being terminated—complaints by (1) Eden Terrace staff about her lack of responsiveness
to residents and her rude and arrogant attitude towards staff calling her on
behalf of residents, and (2) employees, residents and family members about
“misconduct regarding not providing the services you have promised, not being
available when called, and or providing and charging for services that were not
requested,” and “regarding your mistreatment, disrespect and threatening
posture towards our residents regarding telling them who they can and cannot
speak to, what they can say regarding your services and threatening to turn
them in if they do not do as you[] say or pay your bill.”  Again, Collins does not dispute that
Roccaforte had received such complaints—she instead objects to the characterization of the underlying
events.  

We are mindful that “a plaintiff
can bring a claim for defamation when discrete facts, literally or
substantially true, are published in such a way that they create a
substantially false and defamatory impression by omitting material facts or
juxtaposing facts in a misleading way.”  
Louis v. Mobil Chem. Co., 254
S.W.3d 602, 610 (Tex. App.—Beaumont 2008, pet. denied) (citing Turner, 38 S.W.3d at 115).  But “[l]iterally true statements are not
slanderous merely because others might infer dishonesty.”  Id.
(citing Randall’s Food Mkts., Inc. v.
Johnson, 891 S.W.2d 640, 646 (Tex. 1995)).

Because it is undisputed that the
letters are literally true in that they accurately recite that Roccaforte
received certain complaints about Collins’s alleged wrongdoing that led to her
being barred from the property, the only issue is whether they were published
in a way that created such a false and misleading impression so as to render
the true statements defamatory.  We
conclude that Roccaforte’s barring Collins from the premises immediately with
publication of that decision only given to Collins, her three clients, and
employees of Eden Terrace does not render the otherwise true statements in the
Collins Letter and Residents Letter defamatory. 


We accordingly sustain the
defendants’ first cross-issue.  Given our
resolution of this issue, we need not reach the defendants’ second and third
cross-issues.  For the same reasons, we
also overrule Collins’s fourth issue arguing that the “evidence conclusively
establishes as a matter of law Collins[] should have prevailed on her claim for
defamation.”  

BUSINESS DISPARAGEMENT

In her eleventh issue, Collins
argues that the jury’s negative answer to Jury Question No. 10—i.e., “Did Nick Roccaforte disparage the
business of Mary Collins?”—is against
the great weight and preponderance of the evidence and is manifestly
unjust.  She contends that the same
arguments supporting of her defamation claim support the argument that she has
established her claim for business disparagement as a matter of law.  In addition, she argues that Roccaforte acted
with malice, as a matter of law, because “Roccaforte made no serious attempt to
verify the information reported to him by the Stivers or in the daily
logs.”  

In response, the defendants note
that while business disparagement is similar to defamation, “more stringent
requirements have always been imposed,” on business disparagement claims.  See
Newsom v. Brod, 89 S.W.3d 732, 735 (Tex. App.—Houston [1st Dist.] 2002, no
pet.).  They argue that the jury’s
finding is supported by ample evidence and, in particular, contend that Collins
has not conclusively established, as required to defeat the jury’s finding of
no business disparagement, that (1) Roccaforte did not receive complaints about
Collins, (2) that Roccaforte acted with malice, and (3) that Roccaforte’s
communications were not privileged. 
According to defendants, ample evidence supports the jury’s finding of no
business disparagement.

A.   Applicable Law   

      To prevail on a business disparagement
claim, a plaintiff must establish that (1) the defendant published false and
disparaging information, (2) with malice, (3) without privilege, (4) that
resulted in special damages to the plaintiff. Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 766 (Tex. 1987).
 “A business disparagement claim is
similar in many respects to a defamation action.” Forbes Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167, 170 (Tex.
2003).  “The two torts differ in that
defamation actions chiefly serve to protect the personal reputation of an
injured party, while a business disparagement claim protects economic
interests.”  Id.  “[A] business
disparagement defendant may be held liable ‘only if he knew of the falsity or
acted with reckless disregard concerning it, or if he acted with ill will or
intended to interfere in the economic interest of the plaintiff in an
unprivileged fashion.’” Id. (quoting Hurlbut, 749 S.W.2d at 766).  

B.   Analysis

The jury was instructed:

A person disparages the business of another
if he publishes a disparaging false statement about the business, and, when he
publishes the statement, he knows that falsity of the statement or acts with
reckless disregard of whether the communication is false/acts with ill will or
intends to interfere with the economic interest of Mary Collins, and his
publication of the statement played a substantial part in inducing others not
to do business with Mary Collins and resulted in a specific pecuniary loss to
Mary Collins. 

Because the jury found no business disparagement,
Collins has the burden here of conclusively establishing each element of
business disparagement, which she has not done. 
Given our conclusion that the defendants conclusively established the
substantial truth of the Collins Letter and the Residents Letter, Collins
cannot establish that the defendants published “a disparaging false statement,”
a required element of a business disparagement claim.  We overrule Collins’s eleventh issue.

DEFAMATION PER SE, REPUBLICATION AND SELF-PUBLICATION     

In her ninth issue, Collins argues
that the “trial court erred by excluding Collins’ claims of defamation per se,
republication, and self-publication in the trial court’s jury charge and
denying Collins’[s] request for findings of fact and conclusions of law.”  In her tenth issue, Collins argues that the
trial court erred by “denying Collins’ JNOV as to the defamation claims of
defamation per se, business disparagement, and republication as a matter of
law.”[4]      

The defendants respond that Collins
waived her complains about failure to submit these theories to the jury both
through her failure to adequately brief these issues here and by failing to
tender proposed questions to the trial court. 
They further argue that there is no evidence of an element of a
self-publication claim, i.e., the requirement that the “defamed person’s
communication of the defamatory statements to the third person to be made
without awareness of their defamatory nature.” 
With regard to self publication, republication and defamation per se,
the defendants also argue that their conclusively proven affirmative defenses
of truth, opinion, and privilege defeat these claims as a matter of law.  Finally, they argue that “Collins’ request
for findings of fact and conclusions of law is completely misplaced” because
they are “only allowed when the case is tried in the trial court without a
jury.” 

A.   Applicable law

Defamation per se is spoken,
written, or printed words that are so obviously hurtful to the person aggrieved
that they require no proof of their injurious character to make them
actionable.  Knox v. Taylor, 992 S.W.2d 40, 50 (Tex. App.—Houston [14th Dist.]
1999, no pet.).  The character of a
statement as a defamation per se, as contrasted from an ordinary defamation,
relates only to whether damages are to be presumed or must be proven. See Shearson Lehman Hutton, Inc. v. Tucker,
806 S.W.2d 914, 922 (Tex. App.—Corpus Christi 1991, writ dism’d w.o.j.).

Although a party is generally not
liable for a republication of a defamatory statement by another, this Court has
held that “[i]f a reasonable person would recognize that an act creates an
unreasonable risk that the defamatory matter will be communicated to a third
party, the conduct becomes a negligent communication, which amounts to a
publication just as effectively as an intentional communication.”  Wheeler
v. Methodist Hosp, 95 S.W.3d 628, 639–40 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

“Self-publication occurs: (1) if
the defamed person’s communication of the defamatory statements to the third
person was made without an awareness of their defamatory nature; and (2) if the
circumstances indicated that communication to a third party was likely.”  Austin
v. Inet Techs., Inc., 118 S.W.3d 491, 499 (Tex. App.—Dallas 2003, no
pet.).  The supreme court has yet to
adopt self-publication as a cause of action, but several courts of appeals
have.  See id.

B.   Analysis     

Each of these theories that Collins
complains was not submitted to the jury or was established as a matter of law—i.e., defamation per se, republication, and
self-publication—require a
defamatory statement.  Because we have
held, as a matter of law, that the defendants conclusively established their
defense of substantial truth, these other theories necessarily fail as
well.  We also agree with the defendants
that Collins has not demonstrated that she was entitled to findings of facts
and conclusions of law on these theories. 
See Tex. R. Civ. P. 296 (“In any case tried in the district or
court court without a jury, any party
may request the court to state in writing its findings of fact and conclusions
of law.” (emphasis added)). 

Accordingly, we overrule Collins’s
ninth and tenth issues.

ADMISSION OF EVIDENCE

In three related evidentiary
issues, Collins requests a new trial.  In
her thirteenth issue, Collins argues that the trial court abused its discretion
by admitting inadmissible evidence.  In
her eighth issue, she complains that the “trial court erred in allowing
inadmissible evidence to be used as evidentiary support for the [defendants’]
affirmative defense of substantial truth.”  
In her twelfth issue, she asserts that the trial court erred by denying
Collins’s motion for a mistrial because Roccaforte testified about inadmissible
evidence.  

Specifically, Collins argues that
the trial court erred in admitting:

-        
Eden Terrace daily logs, 

-        
July 16, 2007 note to file memorializing discussion with Collins and
another health care aid about their need to abide by Eden Terrace’s “no
solicitation” rule,   

-        
September 20, 2007 note to file regarding meeting with Collins in which
her attitude towards staff was discussed and she was instructed she needed to
follow rules about work solicitation, bringing in other employees without
proper documentation, etc.,   

-        
April 4, 2008 note to file “RE: mistreatment of residents by Mary Collins”
documenting Rocaforte’s meeting with the Stivers and the Housers and the
allegations of mistreatment and overcharging, 

-        
Copies of Roy Stiver’s checks to Mary Collins, and 

-        
Sample Residency Agreement 

She further argues that the trial court erred by
denying her motion for a mistrial in response to Rocceforte testifying to the
terms of the Stivers’ contract with Eden Terrace—a contract that had been excluded by the trial court from evidence.    

In response, the defendants argue
the trial court did not erroneously admit any inadmissible evidence and that,
in any event, Collins waived objections to the admission of evidence either in
the trial court or her brief here.  They
also contend that Collins has not established the admission of this evidence
led to an improper judgment and that the actual record does not support
Collins’s argument that she was entitled to a mistrial.  

A.   Applicable Law 

 The admission and exclusion of evidence is
committed to the trial court’s sound discretion.  Moore v.
Bank Midwest, N.A., 39 S.W.3d 395, 401 (Tex. App.—Houston [1st Dist.] 2001,
pet. denied).  “In order to obtain
reversal of a judgment based upon error of the trial court in the admission of
evidence, the [complaining party] must show that the trial court’s decision to
admit the evidence was error and that the error was reasonably calculated to
cause and probably did cause rendition of an improper judgment.”  Atlantic
Mutual Ins. Co. v. Middleman, 661 S.W.2d 182, 185 (Tex. App.—San Antonio
1983, writ ref’d n.r.e.).  “When
erroneously admitted evidence is merely cumulative or does not concern a
material issue dispositive of the case, the error is harmless.”  Mancorp,
Inc. v. Culpepper, 802 S.W.2d 226, 230 (Tex. 1990).  “Harmfulness is determined by looking at the
entire record to see whether the judgment was controlled by the testimony that
should have been excluded.”  Id. 


Hearsay is a “statement, other than
one made by the declarant while testifying at the trial or hearing, offered in
evidence to prove the truth of the matter asserted.” Tex. R. Evid. 801(d). 
Hearsay is generally not admissible except as provided by statute or
other rules. Tex. R. Evid. 802.

A party is entitled to a limiting
instruction when evidence is admissible for one purpose but not another. Tex. R. Evid. 105(a).  Evidence admitted without limitation comes
into evidence for any and all purposes.  Cigna Ins. Co. v. Evans, 847 S.W.2d 417,
421 (Tex. App.—Texarkana 1993, no writ).

When inadmissible evidence is
introduced and the trial court sustains an objection and gives the jury an instruction
to disregard, we presume the jury properly followed that instruction.  Owens-Corning
Fiberglas Corp. v. Malone, 916 S.W.2d 551, 563 (Tex. App.—Houston [1st
Dist.] 1996), aff’d, 972 S.W.2d 35
(Tex. 1998).  To obtain a mistrial, the
complaining party must demonstrate that the evidence was so harmful that it
could not be cured by a limiting instruction, and that its admission was
calculated to cause and probably did cause the rendition of an improper
judgment.  Id.         

B.   Analysis

Collins contends the trial court
erred in admitting Eden Terrace’s daily logs as business records for the
limited purpose of whether defendants conducted a prudent investigation.  According to Collins, this was error because
whether “Roccaforte conducted an investigation as to the truth or falsity of a
statement prior to publication is immaterial.” 


We conclude that it was not error
to admit the daily logs.  Collins does
not argue here that they were not proved up as business records.  The trial court gave a limiting instruction
that “the statements that are contained within the documents themselves are not
being admitted for truth of the matter asserted but rather for the fact that
those statements were made.”  Although
Collins insists that they were irrelevant, they bear on (1) Roccaforte’s
motivations and state of mind (relevant to Collins’s malice and punitive
damages claims, as well as the defendants’ “good faith” and colorable right to
interfere defense), and (2) the defendants’ substantial truth defense (relevant
to whether Roccaforte was truthful when he said that he had received complaints
about Collins).  

We likewise reject Collins’s
complaints about the admission of the three documents that Roccaforte drafted
for Eden Terrace’s file.  Collins argues
that “the trial court’s rationale for the allowing the defense to admit
[Roccaforte’s notes] . . .  for the
purpose of demonstrating that the appellees conducted an investigation was an
abuse of discretion because the exhibits were unfairly and highly prejudicial
compared to the weight of their probative value.”  These documents were prepared by Roccaforte
and they tend to show his state of mind and are relevant to rebutting Collins’s
theory that he acted reckless in response to Stivers’s complaint without any
basis.  Moreover, Collins does not
explain how these exhibits are “unfair[] or highly prejudicial.”

Collins next complains that copies
of Roy Stiver’s checks to her should not have been admitted because “the
originals would have been the best evidence to present to the jury” and because
they “were not legible and clearly altered.” 
The defendants point out that the trial court initially excluded these
check copies, and then Collins’s counsel opened the door to their later
admission while cross-examining Roccaforte. 
This evidence was cumulative of several people’s testimony about how
much the Stivers paid to Collins. 
Collins has wholly failed to show that any error in admitting these
check copies was harmful.  

Finally, in related arguments,
Collins argues that it was error for the trial court to admit the Sample
Residency Agreement, and that the court should have granted her motion for
mistrial when Roccaforte testified that the Housers had executed a similar
residency agreement with Eden Terrace. 

 The defendants argue that the Sample Residency
Agreement was properly admitted and that, in any event, Collins has failed to
show that no other similar evidence was admitted or that admission of this
exhibit probably caused the rendition of an improper judgment.  We agree. 

As for Roccaforte’s testimony about
the Stiver’s agreement, the defendants contend that Collins opened the door to
this testimony by asking whether he had reviewed the Sample Residency Agreement
with the Housers, which invited Roccaforte’s answer that the Housers executed
their residency agreement before Roccaforte was employed at Eden Terrace.  Collins has not demonstrated how Roccaforte’s
acknowledging that the Housers signed a residency agreement with Eden Terrace
probably caused the rendition of an improper judgment.  

We overrule Collins’s twelfth and
thirteenth issues.    

CONCLUSION

We affirm the trial court’s judgment.  

       

 

                                                                   Sherry
Radack

                                                                   Chief
Justice 

 

Panel
consists of Chief Justice Radack and Justices Higley and Brown.

 











[1]
          The trial court sustained
Collins’s evidentiary objections to the Stiver family’s residency contract and
excluded it from evidence.  The court
admitted, though, a sample residency agreement, which is a “typical residency
agreement that is made between [SSLM] and the independent person who moves into
the community.”    





[2]
          Prior to entering this fixed,
long-term agreement, they had used Collins’ services occasionally on an
as-needed basis for $10 per hour.      





[3]
          We note there has been some inconsistency
in opinions from this Court about who carries the burden of proving truth or
falsity of the statement when a private plaintiff sues a non-media defendant on
a private issue.  Compare  El-Khoury v. Kheir, 241 S.W.3d 82, 85 (Tex. App.—Houston [1st
Dist.] 2007, pet. denied) (plaintiff must prove falsity), with Rodriguez v. Printone Color Corp., 982 S.W.2d 69, 73 (Tex.
App.—Houston [1st Dist.] 1998, pet. denied) (defendant must prove substantial
truth).  We need not resolve this issue,
however, as the burden placement does not alter our resolution of this
issue.    





[4]
          We do not address business
disparagement in this section because, although Collins included that claim in
her tenth issue, we disposed of that claim in the previous section addressing
her eleventh issue.